[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
By complaint dated October 8, 1998, the plaintiff husband, James G. Schelling, commenced this action seeking a dissolution of marriage on the grounds of irretrievable breakdown and other relief. The defendant wife, Susan G. Schelling, appeared through counsel and filed an answer and cross-complaint dated October 16, 1998. Both parties appeared with counsel on December 14, December 16 and December 17, 2000 and presented testimony and exhibits. The court, after hearing the testimony and reviewing the exhibits, makes the following findings of fact.
The plaintiff husband married the defendant wife (whose prior name was Susan C. Goodman) on June 28, 1986 in Mt. Sinai, New York. He has resided continuously in the State of Connecticut for one year next preceding the date of the filing of this complaint. All statutory stays have expired. The parties have no minor children born to the defendant wife since the date of the marriage. The court further finds that no state or municipal agency has or is contributing to the support of the parties.
The plaintiff husband is 55 years of age, in good health and currently lists his occupation as "retired". He formerly worked for CIGNA as an Investment Manager. His employment was terminated on August 18, 1999 after a 25 year career with the same company. CT Page 3941 It was the plaintiffs intention to retire at age 55-56. He received a severance package which included $152,000.00 to be paid bi-weekly from September, 1999 to August, 2000. In September, 2000 he will receive, approximately $62,766.00 per year pursuant to a qualified pension plan and beginning February 1, 2001 an additional $22,500.00 per year of non-qualified pension monies. He is precluded from working for any of CIGNA's competitors.
The defendant wife is 46 years of age, in good health, and currently is employed as a special education teacher in the West Springfield, Massachusetts public education system. She earns $39,416.00 per year, receives gas reimbursement of $20.00 per month and a summer salary of $2,500.00 as the Tennis Director at the Suffield Country Club and additional modest amounts for work on the West Springfield school system's health curriculum. She also receives $220.00 per week child support from the father of her children from her first marriage together with reimbursement for gasoline, travel expenses and auto insurance. She holds a Masters Degree and her continued employment in the education field appears promising.
It is the second marriage for both parties. At the time of their marriage the defendant had very little in the way of assets except for household furniture and a 1984 Audi 4000 given to her by the plaintiff before marriage.
Prior to the marriage the plaintiff owned a single-family residence at 1125 Hill Street in Suffield, Connecticut. The property was purchased on May 7, 1979 for $230,000.00 and sold on October 15, 1986 shortly after the parties marriage for $305,000.00. On July 11, 1979 the plaintiff and his former wife, Penelope P. Schelling, mortgaged the property for $120,000.00 which had been paid down to $113,500.00 at the time of the sale. The court finds that the plaintiffs premarital equity in the property amounted to $191,500.00 less $45,000.00 due to Penelope P. Schelling which was paid to her after the marriage of the parties. Further, the closing costs and related charges amounted to approximately $20,000.00.
In addition to the aforementioned real estate the plaintiff also had premarital assets of $76,538.18 consisting of $8,971.85 in Vanguard Retirement Fund, $23,980.24 in CIGNA Profit Sharing Plan and $43,586.09 in CIGNA Saving's and Investment Trust. However, the closest valuation date for each of these assets was CT Page 3942 December 31, 1986, 6 months post marriage. The defendant questioned the values based upon the amounts listed by the plaintiff on his financial affidavit in his prior dissolution proceedings and an Antenuptial Agreement dated May 30, 1986 (which the parties stipulated is invalid). The Court finds that the amount of the premarital assets is $76,538.18.
In summary the total amount of the plaintiffs premarital assets are found to be $223,038.18.
Each of the parties had children from previous marriages. The plaintiffs children were ages 11, 9 and 7 and the defendant's 7, 4 and 2 when the parties married. All of the defendant's children lived with the parties until they left for college. For a period of time one of the plaintiffs children also resided with the parties. The plaintiff paid from his current income all of his children's college expenses and support for the defendant's children as well as some of the prep school and college expenses. The defendant used most of her income from earnings and child support to pay for her children's college education by the creation of Uniform Gifts to Minors Act ("UGMA") accounts. The plaintiff also contributed to these accounts. As of September 30, 1999 there were UGMA accounts in each of the defendant's children's names having individual values of $3,760.02. The plaintiff is the custodian. He is ordered to forthwith relinquish his custodianship and transfer the accounts to the defendant as successor custodian. In the orders hereinafter set forth the court will not consider (except as noted) the disproportionate amounts received by the children based upon the testimony of the parties and their understanding the educational expenses would not play a part in the orders of the court. However, the court has considered a transfer by the plaintiff to one of his children's accounts after the parties separated and shortly before trial.
For many years the plaintiffs relatives were and continue to be involved in the business of growing oranges. Two of the plaintiffs children are presently involved in this type of business and as of March, 2000 he plans to move to California and join them.
On or about December 26, 1996 Schelling Groves, L.L.C. acquired by purchase 34.69 acres of land in California to be used for the purpose of growing oranges. Schelling Groves, L.L.C. was formed on December 3, 1996 by the plaintiff and his daughter, Amanda. CT Page 3943 The plaintiff contributed 99% and Amanda contributed 1%. The plaintiff considered the purchase as a long-term investment for himself and eventually for transfer to his children. The purchase price was $378,000.00 together with closing costs and adjustments of $8,595.94 for a total of $386,595.94. The plaintiff invested $161,795.94 and the remainder was financed by a First Deed of Trust to American Farm Mortgage ($224,800.00). By instrument dated December 17, 1997, the plaintiff transferred a 1% interest to his daughter Katherine. By further instrument dated August 19, 1998, the plaintiff rearranged the membership interests whereby he retained 10% and his three children, Amanda, Katherine and Emily each owned 30%. There was no evidence that the plaintiffs children paid for their interests. According to the plaintiff he effectuated the transfer of 90% to his children for "legacy" purposes, tax advantages and his childrens' effective tax rates were lower. The plaintiff benefitted from the tax losses incurred in 1996 and 1997 but the business turned profitable in 1998. The court finds that Schelling Groves, L.L.C. has a value of $290,000.00 for distribution purposes considering the initial and additional contributions made by the plaintiff and the profitability of the grove.
As previously noted each of the parties had three children from previous marriages. The plaintiffs children are somewhat older than the defendant's children. The plaintiff is 9 years older than the defendant. Contributing to the breakdown of the marriage were the differing goals each of the parties had with respect to their life together.
The parties first met in 1984. At the time, the defendant was living on Long Island with her 3 children in a home owned by her father. She was receiving child support and held miscellaneous jobs to make ends meet. She was also receiving food stamps. At the time, plaintiff resided at 1125 Hill Street in Suffield, Connecticut which was owned by him. The parties started dating and would spend weekends together alternating between their residences. After the parties married, the defendant and her children took up residence in the plaintiffs home.
The defendant didn't want to continue to live in the home since it had been the residence of the plaintiffs first wife. In October, 1986 the property was sold and the plaintiff, with his funds acquired 933 Newgate Road in West Suffield, Connecticut. The plaintiff took title in his name alone. Title was never transferred to the defendant. CT Page 3944
Prior to and during the marriage the plaintiff was a high wage earner at CIGNA and had been for a considerable number of years. For the first 6 years of the marriage the defendant did not work outside of the home but was the primary caretaker of her children and at times her husband's child, Amanda.
After the first 6 years of marriage the defendant went to work as a temporary substitute teacher and in 1991 worked full-time as a travel agent. In 1992 the defendant returned to school at UCONN in Storrs full-time and summer. She told the plaintiff she wanted to obtain a medical degree. The plaintiff claimed his wife never told him of her plans which would require a full-time commitment on her part for at least 10 years. The marriage began to deteriorate and the defendant withdrew from school, became embittered and the parties grew apart. The defendant returned to work with the West Springfield, Massachusetts school system where she is now involved in a semi-administrative position as an Evaluation Team Leader. Both her bachelors and masters degrees are in physical education.
When the defendant became involved in the tennis program at Suffield Country Club the plaintiff wrongfully accused the defendant of having an extramarital in 1998. This unfortunate accusation was the final problem that led to the ultimate breakdown of the marriage although it started deteriorating in 1995.
Based upon the testimony, the Court finds that both parties contributed to the breakdown of the marriage but to a somewhat greater degree on the part of the plaintiff.
The Court has considered all of the statutory factors of Connecticut General Statutes § 46b-62, 46b-81 and 46b-82 and other pertinent statutes, the parties present earnings and future earning capacity, the causes of the breakdown of the marriage and the consequences of the financial awards as set forth below.
Judgment shall enter dissolving the marriage of the parties on the grounds of irretrievable breakdown. It is further ordered that:
1. ALIMONY
Commencing as of January 1, 2000 the plaintiff shall pay to the CT Page 3945 defendant periodic alimony which shall be tax deductible by the plaintiff and tax includable by the defendant. Alimony shall be non-modifiable as to term except for earlier termination upon the death of either party, the remarriage of the defendant or her cohabitation with another male. The amount of alimony shall be the rate of $750.00 per week for calendar year 2000, $500.00 per week for calendar years 2001, 2002 and 2003 and $400.00 per week for calendar years 2004, 2005 and 2006 with a termination on December 31, 2006.
2. AUTOMOBILES
The plaintiff shall retain ownership of his 1991 Cadillac and 1992 Mercury Sable free of any claims of the defendant and the defendant shall retain ownership of her 1992 Lexus and 1996 Honda free of any claims of the plaintiff.
3. PERSONAL PROPERTY
Each of the parties shall retain possession and ownership of all household furniture and furnishings, personal effects and other items of tangible personal property they presently have in their possession.
4. BANK ACCOUNTS
Each of the parties shall retain ownership of their respective bank accounts free from any claims or demands. Further, the defendant shall be entitled to the balance of the funds being held by her counsel representing the balance of the funds from the sale of Newgate Road.
5. SCHELLING GROVES, LLC
The plaintiff shall retain all of his interest in Schelling Groves, LLC free from any claims or demands of the defendant.
6. STOCKS. BONDS AND MUTUAL FUNDS
The plaintiff shall transfer to the defendant 75% of his Vanguard Cash Reserve Money Market Fund based upon a total value of $150,355.00. The plaintiff shall retain all of his interest in the Galaxy Prime Reserves Money Market Fund and the 1900 shares of Baesa Stock free from any claims or demands of the defendant. CT Page 3946
7. INSURANCE
The plaintiff shall retain any net cash surrender value of the life insurance policy he has with Lincoln Life.
8. IRA ACCOUNTS
Each of the parties shall retain their respective IRA accounts.
9. DEFERRED COMPENSATION
The plaintiff shall retain his deferred compensation plan with CIGNA. The defendant shall retain her deferred compensation plans with Massachusetts Teachers Retirement and Connecticut State Teacher Retirement.
10. 401 K PLAN
The plaintiff shall transfer to the defendant 50% of his 401K plan. Such transfer shall be by way of a Qualified-Domestic Relations Order.
11. LIABILITIES
Each of the parties shall be responsible for the liabilities listed on their respective financial affidavits.
12. ALLOWANCE TO DEFEND
The plaintiff is ordered to pay to the defendant the sum of $25,000.00 within 30 days from the date of this decision as an allowance to defendant this action.
John R. Caruso, J.